Reversed and Remanded in Part; Affirmed
as Modified in Part; and Memorandum Opinion filed June 30, 2011.



 



 

In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-10-00201-CV



 

Beata L. Popek, Appellant

V.

John P. Popek, Appellee

 



On Appeal from the 247th
District Court

Harris County, Texas

Trial Court Cause No. 2007-74720



 

MEMORANDUM  OPINION

 

Beata Popek appeals the trial court’s final divorce
decree on numerous grounds.  We reverse and remand in part and affirm as
modified in part.

Background

 Beata and John Popek married on June 27, 1991 in
Illinois.  The couple had a troubled marriage; Beata suffered from depression
and John had alcohol problems.  John entered an alcohol rehabilitation program
in 2002.  At that time, Beata discovered that she was pregnant with their
daughter, R.P.  John completed the rehabilitation program and moved to Texas
with Beata.  R.P. was born on April 20, 2003.  

Beata, John, and R.P. moved to Virginia in 2005 when
John accepted employment with a government agency.  The couple continued having
marital difficulties while living in Virginia.  When John asked for an
employment transfer to Houston, Beata did not want to move to Texas but wanted
to stay in Virginia.  She did not have sufficient resources to remain in
Virginia and decided to move with John and R.P. to Texas.

Beata, John, and R.P. moved in with John’s sister and
her family to save money.  John and Beata had many arguments while living with
John’s sister’s family.  After an argument on November 22, 2007, Beata left the
house without R.P.  Beata took the couple’s only car and left to visit her
mother in Chicago for two weeks.  Upon her return, John filed for divorce.

Based on Beata and John’s stipulations, the trial
court entered temporary orders on January 16, 2008.  The temporary orders
provided, among other things, that: (1) the parties would have joint managing
conservatorship of R.P.; (2) R.P. would live with John; (3) Beata could have
overnight possession of R.B. on the first, third, and fifth weekend from Friday
evening at 6 p.m. to Sunday afternoon at 4 p.m. if Beata lived in a two bedroom
apartment and provided age appropriate beds for her and R.B.; (3) Beata would
pay child support starting March 15, 2008, or two weeks after she started
full-time employment; (4) R.P. would remain on John’s medical insurance but
Beata and John would share any unreimbursed medical expenses for R.P.; (5) the
parties would obtain on or before January 31, 2008 a software program entitled
Ourfamilywizard.com to communicate with each other about R.P.’s activities; and
(6) the non-possessory party could call the possessory party’s land line to
speak to R.P. between 7 p.m. and 7:30 p.m.

Both parties filed motions to modify the temporary
orders, and the trial court held a hearing on April 29, 2008.  At the hearing,
John testified that Beata had not obtained Ourfamilywizard.com and had not paid
child support.  John testified that Beata had engaged in inappropriate
conversations with R.P. over the telephone.  John admitted that he had refused
to allow Beata contact with R.P. in March 2008 after R.P. became upset and
started crying on the phone while speaking with Beata.  John asked the trial
court to order Beata to attend counseling before allowing her possession of
R.P.

Beata also testified at the hearing.  She admitted
that she did not obtain a two bedroom apartment and that she did not go to her required
appointment with a psychologist, Dr. Laval, on March 1, 2008.  Beata also did
not pay Dr. Laval as previously ordered by the trial court.  Beata admitted to
sleeping while R.P. was in her care; she also admitted to crying in front of
R.P.  Beata testified that she expected her five-year-old daughter to
communicate with her by e-mail.  Beata also testified that she takes medication
for depression, hypertension, and cholesterol.

The trial court denied the motions to modify
temporary orders.  The trial court ordered that Beata would be allowed
visitation when she had an appropriate apartment and saw Dr. Laval.  The trial
court further ordered that Beata’s future visitations with R.P. take place at
the SAFE program so they could be monitored. The trial court stated, “I do not
want you crying around this kid.  I do not want the blubbering stuff to go on.  It’s
inappropriate and it is upsetting to a child. I also do not want anything —
sir, I’m ordering you to tape any conversation that she has with the child.  If
I find that she’s discussing anything about this case with the child, we will
stop all telephone contact.  That is real sick behavior, ma’am.  You do not
need to be telling her you know, just tell her you love her and that’s it.  You
don’t need to be, mommy — so much of what I’m hearing is your needs, not hers.”

The parties agreed to step up periods of possession on
July 7, 2009.  Since then, Beata has had unsupervised overnight possession of
R.P. from 6 p.m. on Friday to 6 p.m. on Sunday.

The trial court held a hearing on October 2, 2009, at
which the parties addressed pretrial matters and Beata waived her right to jury
trial.  Beata acknowledged that she had not filed an inventory and stated that
she “does not have a problem” with the trial court using John’s inventory. 
Beata also stipulated to John’s child support proposal; to joint managing
conservatorship; and to a Harris county residence restriction.  The trial court
set the case for trial on October 19, 2009.

At the two-day bench trial, the trial court heard
testimony from John and Beata.  John expressed his concerns about R.P.’s
emotional well-being if Beata obtained expanded standard possession of R.P. 
John testified that Beata makes R.P. feel guilty and continues to put R.P. “in
the middle between us.  Beata makes promises to [R.P.] that she cannot keep. 
Beata makes demands of [R.P.] that she shouldn’t.”  John testified that Beata
asked R.P. throughout the divorce proceedings to ask John to extend R.P.’s
visitations with Beata and go against the set possession schedule.  According
to John, R.P. gets angry, obstinate, sad, withdrawn, and confused when Beata
breaks her promises to R.P. 

John testified that he is concerned about R.P.’s
physical well-being because R.P. returned with sunburns and, on two occasions,
injuries from overnight visits with Beata.  According to John, Beata does not
provide for R.P.’s basic physical needs; he stated that Beata asked him to pack
clothes, toothpaste, and vitamins for R.P.  The first weekend John did not pack
extra underwear, R.P. wore the same underwear the entire weekend.  In July
2009, R.P. came home without underwear on even though John had packed
underwear.  

John testified that Beata overmedicated R.P. during
one overnight possession; R.P. was drowsy and quiet when John picked R.P. up. 
John stated that there had been other times during the marriage when Beata had difficulty
giving R.P. medication properly.  On another occasion, John informed Beata that
R.P. was not allowed to go to the swimming pool per doctor’s instructions
because R.P. was suffering from ear infections.  Despite the doctor’s
instructions, Beata took R.P. to the pool.  After a visit with Beata in June
2009, R.P. came home and complained of a stomach ache and had diarrhea; R.P.
told John that she ate pizza, spaghetti, ice cream, and grapes that “tasted
really bad and they were wrinkly.”

John also testified that Beata “thinks of herself
first before” R.P.  He stated that, “Each and every time that I have picked
[R.P.] up, she hasn’t had a bath after two days of being in the pool. She is
full of, she reeks of chlorine, has got two days of suntan lotion on. I mean,
just, and it hasn’t changed since the beginning of this whole process.”  John
also testified that R.P. is usually “hungry for dinner” when he picks her up
from a visit with Beata because Beata stays at the pool with R.P. and then
rushes home; John drives R.P. home to have dinner.

John acknowledged that he had been an alcoholic in
the past; he stated that he has been sober since August 28, 2002 and that he
regularly attends A.A. meetings.  John denied being upset and having an
argument with Beata when she came to R.P.’s graduation from Kindercare.

Beata testified at length at trial.  She asserted
that an expanded standard possession order would be in R.P.’s best interest. 
She testified that she was R.P.’s primary caretaker before the Popeks moved
from Virginia to Texas.  Beata acknowledged telling her doctors that she had
felt overwhelmed from the time R.P. was born, had anger issues, did not want to
go out of the house, and that she “just wanted to stay up all night, eat, and
watch TV.”  Beata denied sleeping during the day while taking care of R.P. or being
asleep when John came home from work.  Beata also denied that R.P. had been
anemic and that the cause of R.P.’s anemia was a poor diet; however, she
admitted that R.P. had been taking medication for anemia.

  Beata testified that John physically abused her
when he was drunk; she also acknowledged feeling like a victim for a very long
time.  Beata has been suffering from clinical depression since 1999 and has
been taking medication to treat her depression.  Her medical records show that
she “had bouts with feeling suicidal” in August 2007.

Evidence further revealed that Beata met and
communicated with two men, Tony and Chris, over the internet in 2007 while living
in Virginia.  At trial, Beata denied inviting Chris into her and John’s home
and having sexual relations with Chris on May 24, 2007.  However, Beata’s
interrogatory responses and Dr. Laval’s report showed that Beata admitted
having sexual relations with Chris in the family home while R.P. was asleep. 
Beata later acknowledged that her “act of infidelity” was a poor decision. 
E-mails also showed that Beata wanted to ask her mother to babysit R.P. so
Beata could have sex with Tony.  However, Beata denied actually having sex with
Tony.  She stated that Tony was a friend and that she did not believe her
conversations with Tony were inappropriate.

Beata denied telling people before moving to Texas in
2007 that she was getting a divorce and that she was happy and looking for a
job in Virginia.  She later acknowledged considering divorce and looking for a
job and a roommate because she did not plan to move with John and R.P. to
Texas.  Beata considered moving to Illinois to live with her mother, but then
decided to move with John and R.P. to Texas.  Beata testified that she left
John and R.P. in November 2007 because she felt crowded and tense in the home
of John’s sister.  

Beata testified that her mother provides almost all
of her financial support; she also testified that her mother only paid some of
her bills.  Beata stated that she started working in April or May 2008 and that
she is able to earn about $12.00 per hour, or $23,000 a year.  Beata admitted
that she was supposed to pay John child support for R.P. on March 15, 2008 but
started paying the support on July 14, 2008.  Beata testified that she wants to
go back to college to earn a business degree in order to improve her earning
ability.

Beata stated that she renewed the lease on her one
bedroom apartment and that she bought a proper bed for R.P. on April 1, 2009;
R.P. previously slept on an inflatable bed during visitations.  Beata admitted
not exercising all of her periods of possession or telephone possession and
testified that she understands this is upsetting to R.P.  She acknowledged
crying on the telephone; telling R.P. how much she missed her; sending R.P.
certified mail to tell her how much she missed her; talking to R.P. about
trying to set up possession periods contrary to the court’s order; and asking
R.P. to ask John for more possession periods.  Beata testified that she felt it
was appropriate for her to tell R.P. over the telephone that she had broken her
foot and was in horrible pain.  Beata testified that she drove herself to work
even though she was taking Vicodin pain medication. 

Beata admitted not giving R.P. a bath or a shower
during R.P.’s weekend visits but instead putting her in the swimming pool.  She
admitted that she let R.P. go to the pool even though R.P. was not supposed to
go swimming.  She also admitted that R.P. got sunburns and was injured during
visitations with her.  Beata denied sending R.P. home to John without
underwear.  She also denied overmedicating R.P.

Beata testified that she did not visit with Dr. Laval
for an evaluation as agreed and ordered by the trial court.  She also testified
that she no longer sees a counselor for her anger and mental health problems
and that she does not recall when she last saw a counselor.  Beata has been
treated for clinical depression since 1999.  She admitted that she is feeling
like a victim.  Beata testified that she has changed in the past two years and that
she has become wiser, less overwhelmed, more content but sad about losing her
family and not seeing R.P. as much.

Beata testified that her current employer is flexible
so that she could take and pick up R.P. from school if the court were to grant
her request for expanded possession.  The trial court questioned how much time
it would take to travel from Beata’s workplace to school and then to her
apartment in the late afternoon or evening.  Also, there was concern about how
much time it would take to drive R.P. from Beata’s apartment to school
considering morning rush hour traffic.  Beata testified that it takes 45
minutes to drive from R.P.’s school to her apartment.

After John and Beata testified, the trial court
listened to excerpts from telephone conversations between R.P. and Beata.  The
parties rested and the trial court asked to address John and Beata.  The trial
court expressed concern about Beata’s parenting skills.  The trial court stated
that it would enter a standard possession order and that possession could be
modified in the future depending on whether Beata gets counseling and “things
later” change.  The trial court also stated that it is convinced that Beata
needed “some time to work on” herself and needed to “take some serious, serious
parenting classes.”  At the conclusion of trial, the court granted the parties’
divorce and took the final division of the parties’ marital estate under
advisement. 

On November 11, 2009, the trial court held a hearing
on John’s motion for emergency hearing to modify temporary orders and issue
further temporary orders that would modify Beata’s possession and access of
R.P. “in such a manner that it would be in the child’s best interest and
protect the child’s physical, emotional and psychological well-being.”  At the
hearing, John acknowledged denying Beata visitation and telephone access with
R.P. because R.P. broke her leg during the last fifteen minutes of the October
18, 2009 possession with Beata.  Questioning Beata’s parenting skills and
R.P.’s safety, John asked the trial court to modify Beata’s possession of R.P. 
The trial court denied his request for modification.

The trial court held a hearing on January 28, 2010 before
signing the final divorce decree.  At the hearing, Beta and John stated that
they had agreed to most of the items and language in the proposed decree. However,
Beata objected to the trial court ordering her to pay certain amounts in
cashier’s checks to John.  She contended that the trial court should enter a
judgment against her for John to enforce “as any other judgment in the state of
Texas . . . by delivering it to the Sheriff or Constable with a Writ of
Garnishment.”  The trial court rejected Beata’s request.  The trial court
signed the final divorce decree on January 28, 2010.  Beata timely filed her
appeal.

Analysis

            On appeal, Beata
raises five issues attacking the propriety of the trial court’s standard
possession order and the marital estate division.  

1.                 
Expanded Possession

In her first issue, Beata argues that the trial court
abused its discretion by failing to order expanded standard possession under
Texas Family Code section 153.317. 

A trial court has broad discretion to decide the best
interest of a child in family law matters such as custody, visitation, and possession. 
In re A.L.E., 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009,
no pet.); see Gillespie v. Gillespie, 644 S.W.2d 449, 451 (Tex. 1982).  A
trial court abuses its discretion when it acts arbitrarily, unreasonably, or
without reference to any guiding principle.  Baltzer v. Medina, 240
S.W.3d 469, 475 (Tex. App.—Houston [14th Dist.] 2007, no pet.).  

We remain mindful that the trial court is best able
to observe and assess the witnesses’ demeanor and credibility, and to sense the
“‘forces, powers, and influences’” that may not be apparent merely from reading
the record on appeal.  In re A.L.E., 279 S.W.3d at 427 (quoting Niskar
v. Niskar, 136 S.W.3d 749, 753 (Tex. App.—Dallas 2004, no pet.).  Therefore,
we defer to the trial court’s resolution of underlying facts and to credibility
determinations that may have affected its decision, and we will not substitute
our judgment for the trial court’s.  Id.

Under an abuse of discretion standard, legal and factual
insufficiency are not independent grounds for asserting error but are relevant
factors in assessing whether the trial court abused its discretion.  Id.
at 427; Baltzer, 240 S.W.3d at 475.  There is no abuse of discretion if
some evidence of a substantive and probative character exists to support the
trial court’s decision.  In re A.L.E., 279 S.W.3d at 428; Baltzer,
240 S.W.3d at 475.  We consider only the evidence most favorable to the trial
court’s ruling and will uphold its judgment on any legal theory supported by
the evidence.  In re A.L.E., 279 S.W.3d at 428.

Beata requests relief under the amended 2009 version
of section 153.317.  See Tex. Fam. Code Ann. § 153.317 (Vernon Supp.
2009). Section 153.317 provides: “If elected by a conservator, the court shall
alter the standard possession order . . . to provide for one or more . . . alternative
beginning and ending possession times for the described periods of possession,
unless the court finds that the election is not in the best interest of the
child.”  Id.  Therefore, the trial court may enter an expanded possession
order if it determines that expanded possession is in the child’s best
interest.

Beata argues that the trial court may “craft an order
in any manner to serve in the best interests of a child;” however, Beata
complains that the trial court “completely disregarded professional evidence
and psychological recommendations favorable to ordering an expanded standard
possession order” and based its decision on John’s testimony and one taped
conversation played in open court.  Beata also asserts that the trial court was
biased against her because it accepted John’s “evaluation of events despite his
lack of psychological background.”  According to Beata, the trial court should
not have entered a standard possession order because she is “a loving and
involved mother with no substance abuse issues or problems with law
enforcement.”  

The trial court did not abuse its discretion by
refusing to grant Beata expanded possession of R.P.  The trial court was
involved in this case from the very beginning in January 2008 and was familiar
with the parties and their behavioral history.  During the two-day trial, the
trial court listened to Beata and John’s testimony and heard excerpts of telephone
conversations between Beata and R.P.  Among the numerous exhibits, the parties presented
at trial were Beata’s e-mails showing her mindset and actions as well as Dr.
Laval’s evaluation and recommendation.

John testified that he is concerned about R.P.’s emotional
well-being because Beata made R.P. feel guilty; put R.P. “in the middle” of
their arguments; made promises to R.P. she could not keep; made inappropriate
demands of R.P.; “th[ought] of herself first before” thinking of R.P; and asked
R.P. to request more visitation time with Beata.  According to John, R.P. would
get sad, withdrawn, confused, angry, and obstinate when Beata would break her
promises to R.P.  John also expressed concern about R.P.’s physical well-being
because Beata would not provide for R.P.’s basic physical needs during overnight
possessions.  John testified that Beata did not have any clothes for R.P. at
her apartment; did not bathe R.P. during her possession periods; did not follow
doctor’s orders; and overmedicated R.P. on one occasion.

Beata admitted that she did not bathe R.P. but
instead took her to the pool during overnight possessions; that she let R.P. go
to the pool contrary to doctor’s instructions; that R.P. suffered sunburns and
was injured twice during her possession periods; and that she asked R.P. to ask
John for more possession periods.  Beata acknowledged not exercising all of her
periods of possession or telephone possession and stated that she understood
that this is upsetting to R.P.  She admitted crying on the telephone and
knowing that this would be upsetting to R.P.  She also admitted telling R.P.
“over and over” how much she missed her; sending R.P. messages over the
internet how much she missed her; and even sending R.P. certified mail to tell
her how much she missed R.P.  Beata testified that she did not think it was
inappropriate to tell R.P. that she was suffering horrible pain after breaking
her foot.

Further, Beata acknowledged that she has been
battling and taking medication for clinical depression since 1999.  Beata
admitted feeling overwhelmed and feeling like a victim for a very long time. 
Beata testified that she no longer sees a counselor for her anger and mental
health problems; she stated that she does not recall when she last saw a
counselor.  Beata also admitted exercising poor judgment.  She did not testify
truthfully in court regarding her infidelity — a fact she admitted in her responses
to interrogatories.  Beata’s testimony during trial often was inconsistent and
her answer to uncomfortable questions often was: “I don’t know.”  

At trial, the court expressed concern regarding how
much time it would take to drive from Beata’s apartment to R.P.’s school. 
Beata testified that the commute time depends on the traffic but that it would
take approximately 45 minutes to drive from R.P.’s school to her apartment — a
trip R.P. would have to make Thursday and Friday afternoons and Friday and
Monday mornings under Beata’s expanded possession request.

Dr. Laval’s evaluation and recommendation of October
24, 2008 also was introduced into evidence.  In his report, Dr. Laval stated
that he administered a personality test on John and Beata.  He stated that
Beata “demonstrates emotional instability, dissatisfaction, and restlessness. .
. .  Her results are typical of individuals who are feeling depressed, unhappy,
dysphoric, and indecisive.  They lack confidence and feel inadequate,
worthless, and helpless. Typically, they have very low energy and may have concomitant
feelings of tension, irritability and insecurity.  They feel pessimistic about the
future and they withdraw from social contact.  These individuals may experience
periods of increased agitation and moderate to severe levels of anxiety.  They
feel socially and emotionally alienated, persecuted, and misunderstood. . . .
They tend to be hypersensitive to rejection.”  With regard to John, Dr. Laval
stated that John has “very low levels of emotional distress, and there is an
absence of significant symptoms associated with anxiety or depression.”

Dr. Laval’s report also reflects that he “administered
the Parent Child Relationship Inventory (PCRI), a test designed to identify
specific aspects of the parent-child relationship that may cause problems and
to give an overall picture of the parents[’] view of their relationship with
their child.”  Dr. Laval stated that John and Beata’s results were similar
except for Beata’s “low score on parental support.  This is typical of parents
who describe themselves as over-burdened by their parental responsibilities and
as having very stressful lives.”  

Dr. Laval concluded that Beata “is experiencing much
more psychological turmoil and emotional instability.”  Although Dr. Laval
recommended that “Beata be allowed to have [R.P.] in a manner generally
consistent with an expanded standard possession order,” he also recommended
that Beata “continue to be involved in individual counseling where her issues
with depression and her relationship with R.P., particularly her style of
communicating with her, can be addressed.”  Yet, Beata admitted at trial that
she no longer sees a counselor and that she has no recollection of when she
last saw a counselor.

At the end of trial, the court listened to excerpts
of telephone conversations between Beata and R.P.  These telephone
conversations “either took place after Dr. Laval’s report or they were never
heard by Dr. Laval.”  The excerpts show that Beata (1) often asks R.P. to tell
her that she loves and misses Beata; (2) asks R.P. if she is going to ask how
Beata is doing; (3) makes R.P. feel bad when R.P. does not say “I love you” sincerely
enough and “like she really means it;” (4) makes R.P. feel bad when R.P. does
not “feel like talking;” (5) cries on the phone and makes R.P. cry
hysterically; (6) encourages R.P. to ask John to allow more visitations with
Beata; and (7) thinks R.P. “is only happy because she knows she is going to be
seeing [Beata] in a matter of days.”  

After hearing all the evidence, including the taped
telephone conversations, the trial court expressed concern about Beata’s
parenting skills:

Those tapes are awful, ma’am.  I’m sure you love this
little girl but your parenting skills are awful.  You really need to get some
help in understanding perhaps yourself but also this child.  Because even when
they were pleasant conversations, it’s all about you.  It’s not about her. 
She’s only six years old.  She can’t be for you everything you want her to be.
She can’t be always telling you that she loves you.  She’s not always going to
say what it is that you need her to say and it’s you needing things from her. 
She’s the one who needs the unconditional love of a mother.

*                                  *                                  *

She’s cheerful because she’s going to see me soon.  It’s
all about you.  I’m not saying this in a blaming way.  I’m saying it in what I
hope will be a helpful way for you to go and get some counseling and some help
for this because I know you want to be for your daughter what she needs you to
be.  And I don’t think you’ve done it maliciously at all but I do think you’ve
got some mental health problems that you really need to address and work through.

*                                  *                                  *

And what I heard was a little girl who was being asked to
be the grownup, to be taking care of the mom because you were hurt and wounded
and your ankle hurt or whatever else, and that she was trying to care for you. 
She doesn’t need to be in the role of caring for you.  She’ll get to do that
when you’re 80.  Then she’ll get to take her turn at caring for you but not
when she’s six.

The trial court then stated
that it would enter a standard possession order and further explained:

I’m convinced that you need some time to work on you. And
you’ve probably dedicated a lot of yourself to this little girl in the previous
years and this in a way is a gift for you because it’s a time for you to really
get some therapy and really do some work on understanding yourself and
understanding why you’ve chosen some of the paths that you have chosen and to
take some serious, serious parenting classes.  I mean, not this four-hour COPE
thing or whatever, you know, but, I mean, some real heavy duty stuff.

The trial court also stated
that a later modification of possession will depend on Beata getting
counseling, getting stronger, and improving her parental skills.  The trial
court further expressed concern about Beata’s cognitive dissonance and
encouraged her to work on that condition because “[p]eople don’t exactly know
where you’re coming from when they see [body language] that’s different than
what’s coming out of your mouth.”  That trial court stated, “I was watching you
when you were on the stand and one of the things that you did was, somebody
would ask you a question and you’d say, no. You’d be nodding, yes, while you’re
saying, no, out of your mouth, or you’d be saying, yes, while you were shaking
your head, no.  That’s cognitive dissonance.”

Contrary to Beata’s contention on appeal, the record
establishes that the trial court was not biased against Beata; did not
disregard Dr. Laval’s evaluation and recommendation; did not merely base its
determinations on John’s testimony but also on Beata’s testimony, who confirmed
most of John’s assertions; and did not base its decision on a single
conversation but on the numerous conversation excerpts played at trial.

Having considered the record before us and the
deference to be given to the trial court’s resolution of underlying facts and
credibility determinations that may have affected its decision, we conclude
that the trial court acted within its discretion finding that expanded possession
was not in R.P.’s best interest and entering a standard possession order. 
Accordingly, we overrule Beata’s first issue.

            2.         Reimbursement

            In her fifth
issue, Beata contends that the evidence is legally and factually insufficient
to support a $5,000 reimbursement award in John’s favor against Beata’s
separate property estate.  In the final divorce decree, the trial court ordered
Beata to pay John $5,000 in the form of a cashier’s check to reimburse him “for
monies [Beata] spent before the marriage to make a down payment” on a
condominium Beata purchased in Illinois prior to her marriage to John.  Beata
contends that no evidence was presented in the trial court to support the
$5,000 reimbursement award and that the trial court abused its discretion.

The record establishes that John abandoned his $5,000
reimbursement claim against Beata’s separate property at trial when his counsel
asked him: “And I see that you also have a claim down here for $5,000.00 for a
reimbursement claim against your wife’s separate property estate.  And what are
you asking the Court to do to change with regards to that?” In response to his
counsel’s question, John stated: “Again, I’m no longer requesting that
reimbursement.”

Further, John states in his brief that he “agrees that
the trial court’s decision to award him reimbursement in the amount of
$5,000.00 should be set aside.”  John acknowledges that he did not offer any
evidence to support his reimbursement claim because he abandoned the claim
during trial.  According to his brief, “John agrees that the award of $5,000 as
reimbursement to his separate estate against Beata should not have been
included in the Final Decree of Divorce” and should be struck from the decree. 

Based on the record and John’s admission on appeal that
he abandoned his reimbursement claim against Beata, we conclude that the trial
court erred by ordering Beata to pay John $5,000 in the form of a cashier’s
check as reimbursement.  Because John was not entitled to the reimbursement, the
reimbursement award is struck from the final divorce decree.  Accordingly, we
sustain Beata’s fifth issue.

3.         Division of Marital Estate

            In her second
issue, Beata contends that the trial court abused its discretion by dividing
the marital estate in a manner “so inequitable that it cannot constitute a just
and right division.”  

We review a trial court’s division of community
property for an abuse of discretion.  Murff v. Murff, 615 S.W.2d 696,
698 (Tex. 1981); Knight v. Knight, 301 S.W.3d 723, 728 (Tex.
App.—Houston [14th Dist.] 2009, no pet.); see also Schlueter v. Schlueter,
975 S.W.2d 584, 589 (Tex. 1998).  The test for an abuse of discretion is
whether the trial court acted arbitrarily or unreasonably, or whether it acted
without reference to any guiding rules or principles.  Swaab v. Swaab,
282 S.W.3d 519, 524 (Tex. App.—Houston [14th Dist.] 2008, pet. dism’d w.o.j.). 


In a divorce decree, the trial court “shall order a
division of the estate of the parties in a manner that the court deems just and
right, having due regard for the rights of each party and any children of the
marriage.”  Tex. Fam. Code Ann. § 7.001 (Vernon 2006).  A trial court’s
division need not be equal and may take into consideration many factors, such
as the spouses’ capacities and abilities, benefits which the party not at fault
would have derived from a continuation of the marriage, business opportunities,
education, relative physical conditions, relative financial conditions and
obligations, disparity in age, size of separate estates, the nature of the
property, and disparity in income and earning capacity.  Knight, 301
S.W.3d at 728 (citing Murff, 615 S.W.2d at 699).

A trial court does not abuse its discretion if there
is some evidence of a substantive and probative character to support the
decision.  Id.  However, because the trial court’s discretion is not
unlimited, there must be some reasonable basis for an unequal division of the
property.  Id.  Under an abuse of discretion standard, the legal and
factual sufficiency of the evidence are not independent grounds of error, but
are merely relevant factors in assessing whether an abuse of discretion has
occurred.  Id.

            Beata contends
that the trial court’s division of the marital estate is unjust because (1) John’s
inventory shows that there are insufficient assets in the estate for Beata to
accomplish the $33,250 cash payment ordered in the decree; (2) the cash award
is “impossible” and would leave Beata destitute because the estate does not
have enough funds for Beata to pay a judgment for $33,250; (3) the estate
division is inequitable considering that the bulk of the debt awarded to John
constitutes John’s student loans.

            We first will address
Beata’s contention that the property division was inequitable because the bulk
of the debts awarded to John was his own student loans.  According to John’s
inventory, John’s student loans in the amount of $102,000 and Beata’s student
loans in the amount of $28,121.91 were listed as community liabilities.  Beata
did not file her own inventory and agreed to John’s inventory.  She cannot now
argue that loans are not community liabilities subject to just and right division. 


Further, Beata and John had significant community
debt.  The total value of the marital estate was negative.  Contrary to Beata’s
contention that the division was not favorable to her, the decree reflects that
the trial court’s disproportionate division actually favors Beata.  Under the
decree, John was awarded approximately $15,000 in community assets and an
additional $33,250 to be paid by Beata in cash.  However, because we have held
in issue five that the trial court erroneously awarded John $5,000 as
reimbursement and this award is to be struck from the decree, John’s cash award
is reduced to $28,250.  Taken together, assets awarded to John would total
approximately $44,000.  Community debts totaling approximately $187,000 were
allocated to John; therefore, John was awarded a negative net value of
approximately $143,000.

Beata was awarded approximately $22,000 in community
assets.  In addition to the $28,250 cash payment Beata is required to make to
John, the trial court awarded approximately $28,000 in community debt to Beata —
this amount represents Beata’s student loans.  Beata’s debts total
approximately $56,000; therefore, she was awarded a negative net value of
approximately $44,000.  Compared to John’s negative $143,000 value, Beata
cannot establish that the trial court’s property division is inequitable in
John’s favor and unjust when the trial court ordered John to pay approximately
three fourths of the community debts.  

We next address Beata’s argument that the trial
court’s property division was not just and right because (1) John’s inventory
shows that there were insufficient assets in the marital estate for Beata to
accomplish the $33,250 cash payment ordered in the decree; and (2) the cash
award is “impossible” and would leave Beata destitute because the estate does
not have sufficient funds from which a money judgment for $33,250 could be
paid.

Beata does not cite any authority, and we have found
none, to support her argument on appeal.  To the contrary, courts have held
that “[a] trial court may order a party to pay a cash sum to the other party,
even when there is no cash in the community estate.”  Finch v. Finch, 825
S.W.2d 218, 224 (Tex. App.—Houston [1st Dist.] 1992, no pet.); see Thomas
v. Thomas, 603 S.W.2d 356, 358 (Tex. Civ. App.—Houston [14th Dist.] 1980,
writ dism’d); see also Murff, 615 S.W.2d at 699; Simpson v. Simpson,
727 S.W.2d 662, 663 (Tex. App.—Dallas 1987, no pet.); Hanson v. Hanson,
672 S.W.2d 274, 278-79 (Tex. App.—Houston [14th Dist.] 1984, writ dism’d).  Therefore,
the payment of a money judgment is not rendered impossible merely because a
marital estate does not have sufficient cash funds to cover the amount of the
money judgment a spouse was ordered to pay in the divorce decree.  See Finch,
825 S.W.2d at 224; Thomas, 603 S.W.2d at 358.

Accordingly, we overrule Beata’s second issue.

In sub-issue (a) of issue three, Beata argues that
the trial court abused its discretion by ordering Beata to make cash payments
to John when “no circumstances exist to justify the use of a money judgment to
divide” the marital estate because (1) the court did not “display that
partition in kind was unworkable;” (2) no cash existed in the estate for Beata
to make the ordered cash payments; and (3) the trial court failed to consider
Beata’s “earning capacity, her property or her lack of resources.”

The trial court is given broad discretion to divide
the marital estate “in a manner that the court deems just and right.”  Tex.
Fam. Code Ann. § 7.001; Knight, 301 S.W.3d at 728 n.5; see also
Jacobs v. Jacobs, 687 S.W.2d 731, 733 (Tex. 1985).  The award of a money
judgment is one of the methods a trial court may divide property in a divorce
proceeding in the exercise of its discretion.  Simpson v. Simpson, 727
S.W.2d 662, 663 (Tex. App.—Dallas 1987, no writ); Ratcliff v. King, No.
03-08-00424-CV, 2009 WL 2837706, at *5 (Tex. App.—Austin August 31, 2009, no
pet.) (mem. op.); see Murff, 615 S.W.2d at 699.  A trial court’s
division may take into consideration many factors.  Knight, 301 S.W.3d
at 728; see Murff, 615 S.W.2d at 699.  The nature of the assets and the
circumstances of the parties may provide adequate justification for a trial
court to utilize a money judgment to achieve an equitable division of the
estate.  See Hanson, 672 S.W.2d at 278-79.  

Nothing in the record supports Beata’s contention that
the trial court failed to consider her “earning capacity, her property or her
lack of resources.”  Nor does a just and right division require a trial court
to award all community debts to the spouse with the greater earning potential
or greater resources.  Further, as we have stated above, the parties’ marital
estate consisted primarily of debt. There was not much to divide except for the
parties’ debts.  The overall property division favors Beata, considering that
the trial court ordered John to pay approximately three fourth of the community
debts.  

Additionally, two of the cash payments Beata was
ordered to make were for debts on a credit card held in John’s name.  This
circumstance may reflect a legitimate concern about whether Beata would timely
pay the debt on a credit card issued in John’s name.  The third cash payment
ordered was for a portion of a debt John owed to his mother.  This circumstance
may reflect a legitimate concern about whether Beata would actually pay John’s mother.

Considering Beata’s complaint that the trial court
was not justified in using a money judgment to divide the parties’ estate
because no cash existed in the estate for Beata to make the ordered cash
payments, we already have stated in issue two that a trial court may order one
party to pay a cash sum to the other party, even when there is no cash in the
community estate.  Finch, 825 S.W.2d at 224; Thomas, 603 S.W.2d
at 358.

 Accordingly, we overrule sub-issue (a) of issue
three.

In sub-issue (b) of issue three, Beata contends that
the award of a money judgment against her constitutes an abuse of discretion
because it creates an impossibility and a serious hardship.  

Beata’s impossibility argument re-urges the complaint
she previously raised in issue two and sub-issue (a) of issue three; she argues
the trial court abused its discretion by awarding a money judgment against her
because she “did not have such cash on hand and such cash did not exist in the
community estate of the parties.”  Beata cites no authority, and we have not
found any, for the proposition that an impossibility to satisfy a money
judgment exists because a spouse does not have “such cash on hand and such cash
did not exist in the community estate” to satisfy the amount of the money
judgment awarded to the other spouse.  

Additionally, we already have held that the payment
of a money judgment is not rendered impossible merely because a marital estate
does not contain sufficient cash funds to cover the amount of the money
judgment a spouse was ordered to pay in the divorce decree.  See Finch,
825 S.W.2d at 224; Thomas, 603 S.W.2d at 358.  We overrule sub-issue (b)
with regard to Beata’s impossibility argument.

We next address Beata’s assertion that the trial
court abused its discretion by ordering her to pay the amount of $33,250 within
four days after signing the divorce decree because there was no evidence showing
that she could secure this amount within four days.  According to Beata, the
trial court should have tailored the cash payment order to a time frame that
would not create substantial hardship.

‘“A trial court should set the term for payment of
the cash judgment for as short a period as possible without imposing a serious
hardship on the party responsible to pay the judgment.”’  Finch, 825
S.W.2d at 224 (quoting Hanson, 672 S.W.2d at 279).

John responds in his brief that “[d]espite terms
which ordered Beata’s performance within a short period of time as well as
evidence to suggest that Beata’s own financial liquidity may have been insufficient
to satisfy the amounts due, these circumstances do not exclude the possibility
that she could have obtained the necessary sums from outside sources, including
her mother, who she admitted had consistently supported her throughout the
divorce, including payment of $25,000 to Beata’s first attorney.”  John further
states that “[t]here is absolutely no evidence in the record to suggest that it
would have been impossible for Beata to secure the cash amount of $28,250.00 due
and owing to John within the time required.”

We are not persuaded by John’s argument.  The record
establishes that Beata earns $12.00 per hour; must pay John child support for
R.P.; must pay John reimbursement for R.P’s medical insurance; has little
property; and carries a lot of debt while earning a modest monthly income. 
There is nothing in the record to suggest that Beata could get a loan or
otherwise secure a cash amount of $28,250 within four days, considering also
that she cannot offer collateral or valuables in that amount.  Although Beata
acknowledged that her mother had provided financial support in the past, there
is no evidence in the record to indicate that her mother was able and willing to
give Beata $28,250 in cash.  Evaluating the evidence in this case, we conclude
that the trial court did not “set the term for payment of the cash judgment for
as short a period as possible without imposing a serious hardship on” Beata.  See
Finch, 825 S.W.2d at 224; Hanson, 672 S.W.2d at 279.

Having concluded that the time frame imposed on Beata
to make cash payments in the amount of $28,250 within four days of the signing
of the divorce decree imposes a serious hardship, we conclude that the trial
court abused its discretion and we sustain Beata’s sub-issue (b) in that
regard.

4.         Contemptible Offense 

In her fourth issue, Beata asserts that “[t]he
Court’s entry of an order to deliver $33,250.00 in cashier’s checks is improper
because it creates a contemptible offense in violation of the Texas
Constitutional prohibition on imprisonment for debts.”  According to Beata, the
decree language characterizes her as a constructive trustee of the cash funds,
who is subject to contempt, and not as a debtor, who is not subject to
contempt.  Beata also argues that the trial court abused its discretion by
ordering her “to pay a third party debt” creating “a contemptible offense in
violation of the Texas Constitution.”

Beata’s complaint is premature, and we have
previously recognized that we are not empowered to give advisory opinions.  See
Waite v. Waite, 64 S.W.3d 217, 223 (Tex. App.—Houston [14th Dist.] 2001,
pet. denied).  A complaint is not ripe when determining whether the party has a
concrete injury depends on contingent or hypothetical facts, or upon events that
have not yet come to pass.  Waco Indep. Sch. Dist. v. Gibson, 22 S.W.3d
849, 852 (Tex. 2000).  Because that is the case here, we may not grant Beata
relief.  Beata has not been held in contempt.  And whether Beata could or would
be held in contempt if she violates the terms of the divorce decree “depends on
contingent or hypothetical facts, or upon events that have not yet come to
pass.”  See id.  Additionally, Beata conceded during oral argument that
here complaint is not ripe for review.  

Accordingly, we overrule Beata’s fourth issue.

Conclusion

We overrule Beata’s first, second, and fourth issues. 
We sustain Beata’s third issue with regard to the time constraint the decree imposes
on Beata to make cash payments to John within four days of the signing of the
divorce decree; we overrule the remainder of her third issue.  We sustain
Beata’s fifth issue.  Having sustained the fifth issue, we order the cash
payment in the amount of $5,000 awarded to John as reimbursement struck from
the divorce decree.  Having sustained the third issue with regard to the cash
payment delivery time frame, we reverse and remand for the trial court to set
the term for cash payments in the amount of $28,500 for as short a period as
possible without imposing a serious hardship on Beata; we affirm the remainder
of the trial court’s final divorce decree as modified. 

 








                                                                                    

                                                                        /s/        William
J. Boyce

                                                                                    Justice

 

 

 

Panel consists of Justices Brown,
Boyce, and Jamison.